## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRANCISCO RIOS BALDERRAMA,     :
                           :
       Plaintiff,         :
                           :
    v.                    :  Civil Action No. 04-1617 (JR)
                           :
U.S. DEPARTMENT OF HOMELAND    :
SECURITY, *et al.*,           :
                           :
       Defendants.       :

## MEMORANDUM

Francisco Rios Balderrama seeks declaratory and injunctive relief against several United States agencies under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Plaintiff also seeks money damages under the Privacy Act. The defendant agencies have, in three separate motions, moved for summary judgment. For the following reasons, defendants' motions for summary judgment [Dkt. ##12, 15, 23] will be **granted**.

1.    **Background**

Plaintiff is incarcerated at the United States Penitentiary in Pollock, Louisiana, Dkt. #1 at 1, serving a life sentence after his conviction for violating 21 U.S.C. §§ 848 and 846, continuing criminal enterprise; 21 U.S.C. §§ 841(a)(1) and 18(2), aiding and abetting possession with intent to distribute

marijuana; and 18 U.S.C. § 1956(h), conspiracy to commit money laundering.  Dkt. #12- 1 at 5.

Plaintiff was the leader of a complex criminal organization, Los Tres De la Sierra, that distributed $57 million in illegal narcotics.  Id.  He was arrested in September 2000, after a flight from Canada, at the airport in Sydney, Australia. Dkt. #1-5 at 9.  In September 2001, plaintiff apparently escaped from a detention center in Sydney, Dkt. #1-5 at 11.[1]  He was recaptured in October 2001, Dkt. #1-5 at 11, and was held in Australia until his May 2002 extradition to the United States. Dkt. #1-2 at 9-13; Dkt. #1-5 at 8, 11.  He was not charged with "escape" in Australia because he was already "encumbered by the extradition process."  Dkt. #1-7 at 15, 16.

Upon plaintiff's entry into the prison system in 2003, the Bureau of Prisons considered plaintiff a high-risk inmate, and placed him in a two-hour watch program.  The program requires any inmate determined to be a high risk inmate to report to staff every two hours from 6:00 AM to 10:00 PM.  Inmates included in the program are those considered to be escape risks, disruptive group leaders, high profile inmates, and others for whom the program is deemed appropriate.  Dkt. #12-1 at 4.

---

[1]    Plaintiff perhaps escaped by driving a delivery truck through the gates of a secure facility, Dkt. #1-7 at 8; the Bureau of Prisons indicates that such an event occurred, but does not date it.  Plaintiff denies that he ever escaped.

Plaintiff quickly challenged his placement in the two-hour watch program, Dkt. #1-7 at 1-6, in part based on what he believed was the Bureau of Prison's improper reliance on certain information in his Pre-Sentencing Investigation Report (PSI), Dkt. #1-7 at 3. Plaintiff also began requesting documents, under FOIA, from various federal agencies with information about his arrest, conviction, and detention. Dkt. #1 at 2-9.

A.   <u>Bureau of Prisons: Privacy Act and FOIA</u>

    i.   <u>FOIA</u>

Federal Bureau of Prisons (BOP) policy does not allow inmates to maintain possession of their PSIs. Dkt. #1-6 at 2. On April 18, 2004, plaintiff filed a FOIA request with the Office of the General Counsel for the Bureau of Prisons, requesting that his PSI be released to a third party, Ester Gonzales. Dkt. #1-6 at 2. By June 2, 2004, he had received no response, and submitted a FOIA appeal to the United States Department of Justice (DOJ) Office of Information and Privacy (OIP) based on BOP's failure to respond. Dkt. #1-6 at 3. On July 19, 2004, having received no response from his appeal, he sent a third letter, attaching his original FOIA request, and FOIA appeal. Dkt. #1-6 at 4.

At almost the same time, the DOJ-OIP responded to his June 2, 2004 appeal, indicating that the BOP never received plaintiff's original April 18, 2004 letter. DOJ-OIP suggested

that plaintiff resubmit his original request, and closed his
appeal.  Dkt. #1-6 at 5.  Plaintiff then resubmitted his request,
on July 27, 2004, to the BOP address suggested by DOJ-OIP.  Dkt.
#1-6 at 6.  On September 10, 2004, BOP responded that plaintiff's
PSI could not be released to a third party.  Under BOP Program
Statement 1351.05, "Release of Information," Section 29, a
request that information be released to an authorized third party
is treated as a request that information be released to the
inmate.  BOP could not release the PSI to the plaintiff, and thus
could not release it to his designated third party.  The response
also indicated that the document the plaintiff sought was
available for him to view at Pollock, and that he should contact
the appropriate prison staff.  Dkt. #20-2 at 14.  On October 5,
2004, Plaintiff appealed the response.  As of June 22, 2005, he
had received no response.  Dkt. #20 at 8.  BOP continues to state
that, pursuant to PS § 1351.05, they cannot release plaintiff's
PSI, either to him or to a third party.

      ii.  <u>Privacy Act Claim</u>

      On June 10, 2003, after plaintiff arrived at Pollock,
he filed an "Inmate Request to Staff" addressed to Captain
Jefferson.  Dkt. #1-7 at 2.  Plaintiff stated that he had a court
date at which the court could reconsider his sentence, and might
consider his post-offense rehabilitation efforts.  Dkt. #1-7 at
2.  He asked why he had been placed in the two-hour program,

noting his concern that placement in the program would reflect
poorly on him.  Dkt. #1-7 at 3.  The Captain's terse response
stated:

> You are on the two hour watch program because in 2000
> you escaped from a Maximum Security Prison in
> Australia.  You signed forms with Federal Bureau of
> Prisons on 05-25-2003 stating that you understood that
> you were on the two hour watch program and that you
> understood why.

Dkt. #1-7 at 2.

In September 2003, Plaintiff filed an administrative
complaint.  Plaintiff asserted that "uncharged/dismissed PSI
information [was] used adversely" in determining his security
classification, and that he had a letter vindicating him of the
alleged prior escape.  Dkt. #1-7 at 4, 6.  The Captain then filed
a longer response:

> Many factors are used to determining placement for the
> 2 hour watch program.  While you indicate you were
> cleared of a prior escape from Australia, this incident
> was not the sole contributing factor to your placement
> in the 2 hour watch program.  Financial resources,
> criminal sophistication, violence, and length of
> sentences are all reviewed as part of process.

Dkt. #1-7 at 6.  The Captain pointed out that plaintiff had only
recently arrived at Pollock, and that staff would conduct
periodic reviews of his status to determine whether he should
remain in the program.  Id.

The next day, plaintiff filed a "Request for
Administrative Remedy."  Plaintiff stated that BOP had not denied
relying on the escape information, and that doing so violated

<u>Sellers v. Bureau of Prisons</u>, 959 F.2d 307 (D.C. Cir. 1992).

Plaintiff also denied that he fell into any of the other

categories: no significant financial resources because court had

found he was indigent; no history of violence; no group

affiliation.  As for his life sentence, plaintiff argued that

hundreds of other inmates with life sentences had not been placed

in the two-hour program.  Dkt. #1-7 at 7.  Plaintiff believed

that the alleged escape was the deciding factor in his placement,

and that he was, therefore, improperly classified.  <u>Id.</u>  In short

order, on October 8, 2003, the Warden at Pollock responded:

> An investigation into this matter revealed that while
> you were never charged with the offense of escape in
> Australia, this does not preclude the Bureau of Prisons
> from taking additional steps to ensure public safety.
> A review conducted of your [PSI] and information
> indicates several person(s) testified at trial you fled
> to Australia where you were later incarcerated.
> Further information suggests law enforcement agents
> testified you drove a delivery truck through crash
> gates of a secure facility.  As of January 31, 2003,
> there are no records of you or your attorney objecting
> to or contesting the information contained in your PSI.
> Information suggests you further maintained a
> leadership role in a criminal organization which
> distributed approximately $57 million worth of
> narcotics.  As an additional step, the Bureau of
> Prisons contacted the United States Attorney's Office
> and verified the aforementioned information is
> accurate.  Inaccurate information is the sole basis of
> the decision in <u>Sellers v. BOP</u> which you cite.  Because
> of the aforementioned information, staff believe there
> exists justification for you to warrant continued
> placement in the 2 hour watch program.  Based on the
> above findings, your Request for Administrative Remedy
> is denied.

Dkt. #1-7 at 8.

Two weeks later, on October 22, 2003, Plaintiff appealed the warden's decision to the BOP Regional Director.  He challenged the warden's reading of <u>Sellers</u>, the use of the allegedly incorrect information, and the BOP's differential treatment of other similarly situated prisoners.  Dkt. #1-7 at 9. The regional director reviewed plaintiff's appeal, and responded:

> As the Warden indicated, staff contacted the United States Attorney's Office and verified the information you allege to be inaccurate is accurate.  Therefore, based on you [sic] fleeing to Australia, and your leadership role in a criminal organization which distributed approximately $57,000,000 worth of narcotics, justification exists for your continued placement in the Two-Hour Watch Program.  Based on the above information, your appeal is denied.

Dkt. #1-7 at 10.

On November 27, 2003, plaintiff appealed to the BOP Administrative Remedy Section, alleging that the administration erred in its continued emphasis on his alleged escape.  In response to his appeal, on February 4, 2004, BOP stated:

> As noted by the Warden and Regional Director, while you were never charged with the offense of escape in Australia, this does not preclude the Bureau of Prisons from taking additional steps to ensure public safety... There exists justification for your continued placement on the Two Hour Watch Program.  Accordingly, your appeal is denied.

Dkt. #1-7 at 13.  On September 20, 2004, plaintiff filed suit, alleging Privacy Act violations under 5 U.S.C. § 552a.

- 7 -

B.  <u>Department of Justice, Criminal Division and United</u>
    <u>States Attorney: FOIA</u>

On July 22, 2003, plaintiff filed FOIA requests with

the Criminal Division of the DOJ.  Dkt. #1-2 at 2-3.  Plaintiff

asked for a copy of a cashed check paid to an informant; the

order for his extradition; the certified application for

executive surrender and all other related data; the indictment

and affidavits accompanying the demand for his surrender and

extradition; the order of arrest or complaint given to the

Australian authorities for his apprehension in September 22,

2000; any arrest warrants prior to September 22, 2000; and any

and all other information on his case not otherwise exempted by

statute.  Dkt. #1-2 at 2-3.  On September 17, 2003, he received a

statement from the DOJ that his request had been directed to the

appropriate offices: the DOJ Criminal Division, and the Executive

Office for United States Attorneys.  Dkt. #1-2 at 7.

On October 23, 2003, Criminal Division notified plaintiff that to

respond to his FOIA request, the division needed additional

information.  Enclosed with the letter were two forms plaintiff

could use to provide the information, which plaintiff returned on

October 28, 2003.  Dkt. #23-1 at 3.  The Criminal Division

responded, on January 15, 2004, that it had received his request,

assigned it file number 200301358P, and would search their

records and respond.  Dkt. #1-2 at 5.  On February 25, 2004,

plaintiff appealed to DOJ-OIP, alleging that he was being given a

bureaucratic run-around, and demanding expedited release of his records because more than forty days had elapsed since the correct DOJ division had received his request.  Dkt. #1-2 at 6. On August 27, 2004, the Criminal Division notified plaintiff that it did not have any responsive records for him.  Dkt. #23 at 3.

When plaintiff made his FOIA request, he listed his last name as "Balderrama" and his middle name as "Rios."  When DOJ Criminal Division ran searches in January and August 2004, it found no responsive results.  Dkt. #23 at 10.  A first search of Criminal Division's centralized records index on January 23, 2004, and second search on August 13, 2004, found no responsive records.  Dkt. #23 at 4.  In response to a "Privacy Act Systems of Records" form that plaintiff filed, DOJ performed additional searches in several more systems and offices.  Dkt. #23 at 5. Because plaintiff stated on his "Privacy Act Identification and Request Form" that he had been extradited from Australia for the importation of marijuana from Mexico to the United States, DOJ also searched the Office of Internal Affairs, the Narcotics and Dangerous Drug Section, and the Asset Forfeiture and Money Laundering Section.  A standard FOIA search sheet with a copy of plaintiff's request was transmitted to all sections that might have responsive records.  Dkt. #23 at 8.

In May 2005, DOJ located a file containing responsive documents under the last name "Rios-Balderrama."  After an

additional record review, DOJ found that the file contained 48
relevant documents, 34 of which originated in the Criminal
Division and 14 of which came from other agencies.  Dkt. #23 at
10.  In a letter dated June 30, 2005, the Criminal Division
alerted the plaintiff that it had located 48 documents, and that
33 of those were being released to him in whole or in pertinent
part.  Enclosed with the letter were copies of 33 documents.
Dkt. #23 at 10-11.  All other documents were withheld pursuant
to FOIA exceptions found at 5 U.S.C. § 552(b)(5), (b)(6),
(b)(7)(C), and (b)(7)(D), and certain items were referred to
other agencies for processing.  Dkt. #23 at 11.

        The items referred to other agencies for processing
were: CRM-35, which originated from the Office of the United
States Attorney for the Western District of Texas, and was
referred to the Executive Office for the United States Attorney;
items CRM-36 through CRM-39, which were referred to Immigration
and Naturalization Services; items CRM-40 through CRM-43, which
went to the United States Marshal Service; item CRM-44, sent to
the Bureau of Prisons; and items CRM-45 through CRM-48, which
went to the Department of State.  Dkt. #23 at 9.

        On July 14, 2005, the United States Marshal Service
released an additional seven pages to the plaintiff; limited
information was redacted and withheld pursuant to Exemption 7(c).
The limited information withheld discussed another prisoner, and

related personal information of certain federal officers.  USMS
released all reasonably segregable information to plaintiff.
Dkt. #23 at 13.

      C.   <u>Attorney General: FOIA</u>

      On July 22, 2003, plaintiff submitted a FOIA request to
the Department of Justice for any records in the Office of the
Attorney General related to his case.  Dkt. #15 at 15.  The
letter was forwarded to the DOJ OIP for processing; OIP received
the request on September 23, 2003.  OIP conducted a search of the
electronic database of the Departmental Executive Secretariat
(DES), which is the official records repository for the Office of
the Attorney General.  <u>Id.</u>  The DES uses a central database to
control and track certain incoming and outgoing correspondence
for the Office of the Attorney General.  Records received by the
DES are entered into its electronic database by trained analysts.
<u>Id.</u>  Data elements entered into the system include such items as
the date of the document, the date of receipt, the sender, the
recipient, as well as a detailed description of the subject of
the record.  Dkt. #15 at 16.  To further facilitate location of
the records, key words are also included.  Search parameters can
include subject, organization, date, name, type of
correspondence, or other key words.  <u>Id.</u>

      On September 24, 2003, the OIP FOIA Specialist assigned
to plaintiff's request conducted an electronic search of the DES

database for January 1, 2001 to the present, and the Records
Management System, which covered the period January 1, 1982
through December 31, 2000.  The search term used was plaintiff's
last name, Balderrama.  Dkt. #15 at 16.

OIP did not locate any records responsive to
plaintiff's request as a result of that search.  On October 8,
2003, OIP advised the plaintiff that a records search had been
conducted in the DES and that no responsive records were found.
Id.

Plaintiff appealed the lack of responsive records, and
OIP acknowledged receipt of the appeal on December 10, 2003.  On
January 24, 2004, the Co-Director of OIP advised plaintiff that
he was affirming the determination of the IR Staff that no
records responsive to plaintiff's request could be located in the
Office of the Attorney General.  Dkt. #15 at 17.

In an effort to put the issue to rest, on May 3 and
May 9, 2005, a FOIA specialist conducted an additional search of
the DES, which consisted of a manual search of the paper
historical indices of the DES.  Dkt. #15 at 17. The specialist
did not locate any records responsive to plaintiff's request.
Dkt. #15 at 18.

D.    United States Immigration and Customs Enforcement

On November 3, 2003, the Administrative Center for the
United States Immigration and Customs Enforcement, in Burlington,

Vermont, received a FOIA request from the plaintiff.  Dkt. #12 at
38.  It was assigned control number BUR2003001353.  After a
search of the Central Index, ICE determined that the Oakdale Sub-
district had the plaintiff's alien file, the sole repository of
immigration-related documents.  Dkt. #12 at 38, 39.  Burlington
then generated a transfer letter to the plaintiff and sent a
transfer memorandum to Oakland.  Dkt. #12-1 at 38-39.  When
Oakland received the FOIA request, they searched their files and
sent a letter of acknowledgment to the plaintiff, assigning his
case control number OAK2003000423.  Dkt. #12 at 39.  In the
December 19, 2003 letter, the Oakland office notified plaintiff
that the contents of his file were being released to him, with
the exception of thirty-five pages that were withheld in their
entirety.  Dkt. #12 at 39.  The pages were withheld pursuant to
FOIA exception (7)(a), because ICE is conducting an ongoing
investigation to determine what criminal activities plaintiff
engaged in and whether plaintiff is deportable.  ICE later
determined that 3 to 8 additional pages were segregable, and
released the redacted documents.  Dkt. #12 at 41.

        No reasonably segregable, non-exempt portions were
withheld from plaintiff.  The documents withheld contain the
names of suspects and witnesses, as well as information
supporting plaintiff's possible deportation.  ICE believes
disclosing the information to plaintiff could identify the

witnesses and suspects and reveal specific evidence ICE has collected of suspected criminal violations.  That disclosure would alert suspects to ongoing investigations.

2.  **Analysis**

    A.  FOIA: Standards of Analysis

        The adequacy of an agency's search under FOIA is "measured by a 'standard of reasonableness,'" Weisberg v. United States Dep't of Justice, 705 F.2d 1344, 1351 (D.C. Cir. 1983), which  varies with the facts of each case.  Id.  The reasonableness inquiry focuses on "the appropriateness of the methods used to carry out the search."  Iturralde v. Comptroller of the Currency, 315 F.3d 311, 315 (D.C. Cir. 2003).  The fundamental question is not "whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate."  Steinberg v. United States Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994).

        At the summary judgment stage, the agency is entitled to prevail if it shows "beyond material doubt [] that it has conducted a search reasonably calculated to uncover all documents."  Weisberg, 705 F.2d at 1351.  To meet its burden, the agency must proffer affidavits or declarations that shed sufficient light on "the scope and method of the search conducted

by the agency," <u>Perry v. Block</u>, 684 F.2d 121, 127 (D.C. Cir. 1982).  The statements must be "'relatively detailed' and nonconclusory and must be submitted in good faith." <u>Goland v. CIA</u>, 607 F.2d 339, 352 (D.C. Cir. 1978).  Because agency affidavits enjoy a presumption of good faith, <u>Ground Saucer Watch, Inc. v. CIA</u>, 692 F.2d 770, 771 (D.C. Cir. 1981), usually it is only the first two factors that are at issue.

Once the agency has successfully satisfied its <u>prima facie</u> obligation, the requester may rebut by presenting countervailing evidence, including evidence of bad faith. <u>Meeropol v. Meese</u>, 790 F.2d 942, 958 (D.C. Cir. 1986).  However, even in situations where the agency acknowledges that the requested document still exists or once existed, "the failure to turn up this document does not alone render the search inadequate." <u>Nation Magazine, Washington Bureau v. United States Customs Serv.</u>, 71 F.3d 885, 892 n.7 (D.C. Cir. 1995).  In a FOIA case, the Court may award summary judgment solely on the basis of information provided in affidavits or declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." <u>Military Audit Project v. Casey</u>, 656 F.2d 724, 738 (D.C. Cir. 1981).

      i.   <u>Bureau of Prisons</u>

      Plaintiff has requested that the Bureau of Prisons send his PSI to a third party, Dkt. #22-1 at 8, and BOP has refused. BOP Program Statement § 1351.05 governs any release of BOP information under the Freedom of Information and Privacy Acts. <u>See</u> PS § 1351.05 at 15(a)(2)(d). It expressly prohibits inmates from obtaining or possessing photocopies of their PSIs. PSIs often contain sensitive information about witnesses and informants involved in a prisoner's arrest and conviction. Dkt. #22-1 at 8. Section 1351.05 is designed to protect inmates from being coerced by other inmates into producing their PSIs and revealing otherwise protected information.

      The prohibition also helps prevent inmate-on-inmate violence. Many of the PSIs contain information regarding the inmate's assistance to federal and/or state law enforcement authorities, community affiliations, financial resources, and details of the inmate's criminal activity. Dkt. #22-1 at 8. The information in the PSIs, if released to other members of the prison community, could result in a range of consequences, from an inmate being placed in protective custody in the Special Housing Unit to inmate-on-inmate assault, resulting in serious injury or death. Dkt. #22-1 at 8. BOP has documented an emerging problem of inmates pressuring other inmates into providing copies of their PSIs. Therefore, BOP will not give

inmates' PSIs to third parties, in an effort to prevent inmates
from being pressured into having their PSIs sent to drop sites or
mail drops where they can be picked up and studied or used for
illicit purposes.  BOP does allow inmates to review their PSIs
"under direct and constant supervision by staff."  PS § 1351.05
at 17.

   BOP's refusal to release plaintiff's PSI to plaintiff
or to a third party is consistent not only with BOP policy, but
also with FOIA exemption (b)(7), which exempts from production
records that could reasonably be expected to disclose the
identity of confidential sources, disclose techniques and
procedures used for law enforcement investigations or
prosecutions, and endanger the life or physical safety of any
individual.

   Plaintiff was the leader of a large-scale,
sophisticated criminal organization, and was subject to an
intensive, multi-faceted investigation.  It is reasonable for the
BOP to have significant concerns about the use, by third parties,
of any information in the plaintiff's PSI.  BOP's refusal to
release his PSI is wholly in keeping with FOIA exemption (b)(7).
Thus BOP did not violate FOIA by refusing to release plaintiff's
PSI to the plaintiff or to a designated third party.

> ii.  Department of Justice, Criminal Division and
>      United States Attorney

In a letter dated June 30, 2005, the Criminal Division alerted plaintiff that it had located 48 documents, and that 33 of those were being released to him in whole or in pertinent part.  Enclosed with the letter were copies of the 33 documents. Dkt. #23-1 at 10-11.  The Division stated that any information withheld was withheld pursuant to FOIA exemptions (b)(5), (6), (7)(C), and (7)(D), and that certain items had been sent to other agencies for processing.  5. U.S.C. § 552(b); Dkt. #23-1 at 11.

FOIA exemption (b)(5) protects "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  The privilege protects documents that are both pre-decisional and deliberative, including "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).  The existence of Exemption 5-protected documents does not depend on the agency's ability to identify a specific decision to which the documents relate.  NLRB v. Sears, Roebuck, & Co., 421 U.S. 132, 151 (1975).

Criminal Division asserted the (b)(5) deliberative process privilege for Items CRM-21, CRM-23, and CRM-34.  Criminal

- 18 -

Division has documented, in detail, the reasons the information was withheld and the kinds of information withheld: names of staff, and email communications and memorandum among staff, AUSAs, and their legal counterparts in the Australian government, with respect to the plaintiff's arrest and extradition.  Dkt. #23-1 at 20-23.

The withheld items are, indeed, all elements of an agency's deliberative process.  Memoranda and email correspondence set forth the attorneys' evaluation of the evidence, identify potential charges, and articulate theories of prosecution.  No document in this case constitutes a final agency decision.  The Criminal Division properly invoked exemption (b)(5) for these documents, and is entitled to summary judgment.

Criminal Division also invoked FOIA exemptions (b)(6) and (b)(7).  Exemption (b)(6) permits the government to withhold all information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). Exemption (b)(7)(c) of FOIA also exempts from mandatory disclosure information compiled for law enforcement purposes when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5. U.S.C. § 552(b)(7)(C).

        The Supreme Court has made clear that all information
that "applies to a particular individual" meets the threshold
requirement for protection under Exemption 6.  Dep't of State v.
Washington Post Co., 456 U.S. 595 (1982).  The documents withheld
in this case under Exemptions (b)(6) and (b)(7)(C) are part of a
law enforcement file and are identifiable by an individual's name
or an identifier applying to a particular individual.  These
documents thus reach the threshold requirement for exemption
(b)(6) protection.  The next step under Exemption (b)(6) involves
determining "whether, on balance, disclosure would work a clearly
unwarranted invasion of personal privacy."  Reed v. NLRB, 927
F.2d 1249, 1251.

        When a criminal justice agency invokes Exemption 7, it
"warrants greater deference than do like claims by other
agencies."  Keys v. U.S. Dep't of Justice, 83 F.2d 337, 340 (D.C.
Cir. 1987).  A criminal justice agency must show that "the nexus
between the agency's activity . . . and its law enforcement
duties" is "based on information to support at least 'a colorable
claim' of its rationality."  Keys, 830 F.2d at 340.  Exemption
(b)(7)(C) has also consistently been held to protect the
identities of suspects and other persons of investigatory
interest who are identified in agency records in connection with
law enforcement investigations; (7)(C) also generally protects
the names of law enforcement officers.  See, e.g., Computer

- 20 -

<u>Professionals for Social Responsibility v. U.S. Secret Service</u>, 72 F.3d 897, 904 (D.C. Cir. 1996); <u>Davis v. Dept's of Justice</u>, 968 F.2d 1276 (D.C. Cir. 1992).

In this case, the individuals whose identities have been protected -- witnesses, undercover officers, informants -- maintain a substantial privacy interest in not being identified with law enforcement proceedings.  Dkt. #23-1 at 29.  They could be subjected to harassment and retaliation.  <u>Id.</u>  Identifying support staff employees or federal agents could make low-profile law enforcement work significantly more difficult.  At the same time, it is unlikely that releasing this information -- identifying specific third parties and individuals -- to the public would serve FOIA's underlying purpose of allowing the public to better understand how agencies function.  <u>See Department of Air Force v. Rose</u>, 425 U.S. 352, 372 (1976). Plaintiff provides no evidence of how the disclosure of such information would meet FOIA's purpose, and there does not appear to be a strong public interest in the information sought. Further, the withheld information also falls under Exemption (b)(7)(D), which protects information that could reasonably be expected to compromise law enforcement sources and methods.  5 U.S.C. § 552 (b)(7)(D).  Thus the withheld documents are properly exempted under FOIA.

It also appears, based on the information provided by the Criminal Division, that the division conducted a reasonable search.  Dkt. #23-1 at 35.  The agency has included the declaration of Kathy Hsu, as well as that of William Bordley, both of which detail the thorough search conducted by the agency of agency records "using methods which [were] reasonably expected to produce the information requested."  Oglesby v. U.S. Dept. of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  The division has thus met its burden of showing that the withheld evidence is properly covered under FOIA exemptions, that the division conducted a reasonable search, and that it is entitled to summary judgment.

iii. Attorney General

The Office of the Attorney General as proffered the Wellman Declaration, Dkt. #15-2, that provides the necessary insight into "the scope and method of the search conducted by the agency."  Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982).  The Wellman Declaration explains the procedures used by OIP to locate responsive documents; it is highly detailed, and offers a clear, concise, and nonconclusory description of the search.  OIP also conducted a thorough supplemental search, as described in the declaration.  The Office of the Attorney General has fulfilled its duties under FOIA, and is thus entitled to summary judgment.

iv.  <u>Customs and Immigration</u>

Defendant United States Customs and Immigration Enforcement (ICE) has filed a FOIA declaration prepared by Debra Laird.  Records responsive to plaintiff's various FOIA requests were found in ICE's custody.  Enforcement has asserted a categorical FOIA (b)(7)(A) exemption, which authorizes agencies to withhold information "compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  ICE is the largest investigative arm of the United States Department of Homeland Security.  Dkt. #12-1 at 19-20.  As such, ICE is due the deference typically given law enforcement agencies when they assert FOIA exemptions.

ICE's alien files contain passports, criminal conviction records, investigative reports, and any documentation relating to a record of removal proceedings.  Dkt. #12-1 at 21.  "Exemption 7(A) . . . is designed to block the disclosure of information that will genuinely harm the government's case in an enforcement proceeding or impede and investigation."  <u>North v. Walsh</u>, 881 F.2d 1088, 1097 (D.C. Cir. 1989).  Here, the ICE withheld certain information that was gathered and compiled while plaintiff was serving his sentence.  Dkt. #12-1 at 23.  The investigation, into whether plaintiff is deportable, is still

- 23 -

open.  Id.[2]  The information collected includes the names of
other suspects and witnesses, as well as evidence collected
during the investigation that supports ICE's case against the
plaintiff.  Dkt. #12-1 at 23.  ICE asserts that disclosing this
information could identify the suspects being investigated, as
well as particular evidence gathered of suspected criminal
violations.  Dkt. # 12-1 at 20.  This assertion is similar to
that made by the Criminal Division, supra.  Exemption (b)(7)(A)
is cited in the Laird Declaration.  As identified, 35 pages of
investigatory records collected in support of ICE's case were
withheld pursuant to Exemption (b)(7)(A).  ICE also asserts
Exemption (b)(6), permitting the government to withhold all
information about individuals in "personnel and medical and
similar files" when the disclosure of that information "would
constitute an unwarranted invasion of personal privacy."  ICE
asserts that there are materials withheld in this matter that are
part of a law enforcement file and are identifiable by an
individual's name or other personal identifier.

        The Laird declaration sufficiently lays out the
information withheld and the exemptions under which the withheld
information is covered.  The Laird declaration also described the

_____

        2    Plaintiff has waived all objections to deportation.
[Dkt. # 20-1

steps taken by ICE in sufficient detail to confirm that ICE's
record search was reasonable, and that ICE is entitled to summary
judgment.

     B.   <u>Privacy Act Claim against the Bureau of Prisons</u>

        Plaintiff alleges that BOP failed to maintain its
records with "such accuracy . . . as is reasonably necessary to
assure fairness."  5 U.S.C. § 552a(e)(5), and that the Bureau of
Prisons thus used inaccurate information from his PSI to place
him in a two hour watch program for high-risk inmates.  Plaintiff
seeks declaratory and injunctive relief and money damages.

        The Privacy Act's subsection on civil remedies
authorizes courts to enter injunctive relief and to order
agencies to amend and individual's record.  5 U.S.C.
§ 552a(g)(2)(A); <u>Doe v. Stephens</u>, 851 F.2d 1457, 1465 (D.C. Cir.
1988).

        Under the Privacy Act, a plaintiff must first establish
that the information in question is covered by the Act as a
record contained within a system of records. 5 U.S.C.S.
§ 522a(b).  Once a plaintiff establishes that the information is
covered under the Privacy Act he must show (1) that he was
aggrieved by an adverse action; and (2) that the agency failed to
maintain records with degree of accuracy necessary to assure
fairness in the determination.  A plaintiff who is able to
establish these first two requirements is entitled to declaratory

and injunctive relief.  <u>Fisher v. NIH</u>, 934 F. Supp. 464 (D.D.C. 1996).  In order to recover monetary damages, under <u>Deters v. U.S. Parole Comm'n</u>, 85 F.3d 655 (D.C. Cir. 1996), plaintiff must make two additional showings: (3) that reliance on the inaccurate records was the proximate cause of the adverse determination; and (4) that the agency acted intentionally or willfully in failing to maintain accurate records.  <u>Deters</u>, 85 F.3d at 657.

In the typical Privacy Act case, "it is feasible, necessary, and proper, for the agency and, in turn, the district court to determine whether each filed item of information is accurate."  <u>Sellers v. Bureau of Prisons</u>, 959 F.2d 307, 311 (1992).  With respect to PSIs, specifically, the D.C. Circuit has held that "[a]s long as the information contained in an agency's files is capable of being verified, then . . . the agency must take reasonable steps to maintain the accuracy of the information to assure fairness to the individual."  The Privacy Act, however, does not require perfect records.  <u>Griffin v. Ashcroft</u>, no. 02-5399, 2003 U.S. App. LEXIS 18321 (D.C. Cir. 2003); <u>Johnston v. Horne</u>, 875 F.2d 1415, 1421 (9th Cir. 1989); <u>DeBold v. Stimson</u>, 735 F.2d 1037, 1041 (7th Cir. 1984).

In <u>Griffin v. Ashcroft</u>, 2003 U.S. App. LEXIS 18321 (D.C. Cir. Sept. 3, 2003)(unpublished), a prisoner brought suit pursuant to the Privacy Act, claiming that the Bureau of Prisons had violated the Act by improperly relying on information in his

PSI, indicating that he had committed a murder and beatings, to place him in a custody classification of "Greatest Severity." The prisoner alleged that the BOP's reliance on this information was improper because the charges relating to the alleged murder and beatings had been dismissed, and claimed that, by placing him in the most restrictive custody category, the BOP had deprived him of benefits relating to prison jobs and remuneration, living quarters, transfers, and good time credits. He requested injunctive relief and damages. Id. at **2-3. The D.C. Circuit stated that the prisoner's claim for damages had no merit, because he offered "no support . . . for the proposition that the BOP may never rely upon evidence of crimes of which a prisoner was not convicted" when making custody classification determinations.

> Nor has appellant made any showing that the facts regarding the "circumstances" of the relevant offense contained in his PSI report were not accurate. Finally, even if the information were inaccurate, appellant has not shown the BOP either had no grounds to believe maintaining the information was lawful or that it flagrantly disregarded his rights under the Privacy Act, see Deters v. United States Parole Comm'n, . . . 85 F.3d 655, 660 (D.C. Cir. 1996), much less that its action was so "patently egregious" or "unlawful" that "anyone undertaking the conduct" would have known it was unlawful. See Laningham v. United States Navy, . . . 813 F.2d 1236, 1242 (D.C. Cir. 1987).

Id. at *4.

In this case, after plaintiff challenged the information in his PSI, BOP contacted the United States

Attorney's office and verified that, as of January 31, 2003, there was no record that the plaintiff or his attorney had contested the information in his PSI.  Dkt. #12-1 at 33.  BOP also verified, with the U.S. Attorney's office that the defendant had fled to Australia, and that, while in custody there, he escaped by driving a delivery truck through the crash gates of a secure facility.  Dkt. #12-1 at 8.

Plaintiff's complaint includes documents that plaintiff claims contradict the BOP's verified facts.  Plaintiff, relies, in particular, on a letter from the Australian Commonwealth Director of Public Prosecutions, Dkt. #1 at 100, which states "I advise as so far as any . . . records show there is no outstanding charge against you for any offense, including escaping from lawful custody."  However, plaintiff himself includes a record that indicates that this lack of charges against him does not necessarily mean that the escape of escape attempt did not happen.  Plaintiff includes a document that states that, upon plaintiff's recapture in Australia, "[t]he [Australian Federal Police] have advised . . . that . . . escape is in itself not an offense since [plaintiff was] encumbered by the extradition process thus there will not be any substantive charges."  Dkt. #1 at 99.  Another document provided by the

plaintiff -- one not attached to his PSI -- shows that plaintiff escaped from Australian custody in September 2001 and his subsequent recapture.  Dkt. #1 at 65.

It is clear, on this record, that the defendant BOP took reasonable steps to confirm the accuracy of the information in plaintiff's PSI, and that they reasonably relied on that verified information in considering the evidence of plaintiff's escape attempts when placing him in the Two-Hour Watch Program. BOP's actions did not violate the Privacy Act.

*       *       *       *       *

For the foregoing reasons, the defendants' motion for summary judgment [Dkt. ##12, 15, 23] will be **granted**.  An appropriate order accompanies this memorandum.


JAMES ROBERTSON
United States District Judge